UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| IVA JEAN SCHMIDT, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>AUDRAIN COUNTY CRISIS )<br>INTERVENTION SERVICES INC., )<br>d/b/a OUR SAFE PLACE )<br>)<br>Serve at: )<br>103 West Monroe )<br>Mexico, MO 65265 )<br>)<br>Defendant. ) | Cause No: 18-57<br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

NOW COMES Plaintiff, by her attorneys, and for her complaint against Audrain County Crisis Intervention Services Inc. D/B/A our SAFE Place, states as follows:

### **Introduction**

1. This matter arises under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq*., the Missouri Minimum Wage Law (MMWL), R.S.Mo. § *290.500 et. seq*., and Missouri common law. Plaintiff was employed as a volunteer coordinator by Audrain County Crisis Intervention Services Inc., D/B/A Our SAFE Place ("Our SAFE Place"). Defendants did not pay Plaintiff minimum wage for all hours worked under federal or Missouri law. Defendants did not pay Plaintiff for off-the-clock work. Defendants also did not pay Plaintiff overtime. Defendant terminated Plaintiff because she wanted to be compensated for her work.

1

**Jurisdiction and Venue**

2.      Plaintiff invokes this Court's jurisdiction under 28 U.S.C. § 1331 to hear and decide claims under federal law. Plaintiff invokes supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear and decide Plaintiff's claims under Missouri state law.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Our SAFE Space is a resident of this District and all events giving rise to this action occurred within the Eastern District of Missouri.

**Parties**

4.      Plaintiff is a citizen of the state of Missouri and currently resides at 10065 State Rd. B, Auxvasse, MO, 65265.

5.      Defendant Our SAFE Place is a Missouri business located at 103 W Monroe St, Mexico, MO, 65265.

**Statement of Facts**
**Common to All Counts**

6.      Defendant Our SAFE Space is an organization that provides services to victims of domestic violence, sexual violence, human trafficking, and stalking. Services include emergency hotlines, lethality assessments, emergency sheltering, residential facilities and transitional housing, transportation in and out of state, training programs, court advocacy, medical advocacy, and therapy referrals for victims. Defendant reaches out to victims via community outreach, its own website, and Facebook.  Defendant is reimbursed by the State of Missouri for some of the services it provides to victims.  Defendant receives a substantial amount of funding through state and federal grants.

7.      Plaintiff was hired as a volunteer coordinator in September 2014.

8. As a volunteer coordinator, Plaintiff's responsibilities included conducting donation transactions, through the mail, over the phone and via credit card, maintaining a cash log, preparing deposits, keeping volunteer records, recruiting and training volunteers, conducting outreach, maintaining the organization's web-site and social media pages and purchasing supplies for the office, online and at local office supply shops.

9. Plaintiff also provided direct advocacy services to victims including carrying a hotline phone for a minimum of one week per month and responding to emergency situations at all hours of the day and night. Plaintiff was often responsible for purchasing bus tickets and facilitating transportation across state lines for victims wishing to flee to family out of state.

10. Plaintiff did not control hiring, firing, or schedule of any other employee.

11. Plaintiff was unable to relieve volunteers from their positions without approval from an executive director.

12. Plaintiff was paid on an hourly basis.

13. At the time of hiring, Plaintiff made $9.00 an hour.

14. Plaintiff received a raise in April 2016 that increased her hourly rate to $14.00 an hour.

15. In April 2018, Plaintiff received another raise that increased her hourly rate to $14.42 an hour.

16. Plaintiff reported to Janelle Williams, the executive director, from 2014-2018.

17. After organizational restructuring in early 2018, Plaintiff reported to Kathy Yohe, the interim executive director and Ms. Williams.

18. In February 2018, Ms. Williams left the organization, and Ms. Yohe replaced Ms. Williams. After that, Plaintiff reported to Ms. Yohe and Tina Gish, the residential services supervisor.

19. Ms. Williams, Ms. Yohe, and Ms. Gish dictated what Plaintiff's responsibilities were each day and set Plaintiff's schedule.

20. Ms. Williams, and later Ms. Yohe, required Plaintiff to submit an activity sheet that logged the tasks she completed during the week.

21. Defendant used the activity logs to seek reimbursement from the state for certain activities and to justify grant funding.

22. Plaintiff was "officially" scheduled to work from 8:00 a.m. to 5:00 p.m., Monday through Friday.

23. However, at hiring, Ms. Williams told Plaintiff she needed to be very flexible, because the job required Plaintiff to work outside the "set" schedule. For instance, Plaintiff would be responsible for weekend and evening presentations in the community as well as carrying and responding to an after-hours hotline phone.

24. Ms. Williams also told Plaintiff carrying and responding to the hotline phone was part of the job requirement, but employees were not paid the time spent carrying the phone or the time spent responding to calls.

25. Ms. Williams further told Plaintiff Defendant does not pay overtime for any hours worked over 40 in a work week.

26. Because of the nature and extent of her job duties, Plaintiff often worked several hours earlier and/or later than her set shift to complete the tasks required of her.

27. For instance, Plaintiff stayed after her set schedule several days a week to meet with community partners to prepare for presentations. Plaintiff also came in before her shift several days a week to set up for community presentations and regularly gave presentations at local churches on Sundays for community outreach and volunteer recruitment.

28. Plaintiff was also responsible for writing for the organizational newsletter and maintaining the website and Facebook page. Plaintiff regularly went into work before 8:00am, stayed late, or wrote from home just to keep up. Plaintiff often worked on the website and created posts for the social media pages well after 5:00pm.

29. Plaintiff carried a hotline phone for a minimum of one week per month. Plaintiff also watched the hotline phone for other employees if they were sick. The hotline phone required Plaintiff to take emergency calls to counsel victims and to provide transportation and immediate emergency assistance to victims in need.

30. Plaintiff often carried both a hotline phone and a lethality phone at the same time, since she was one of the few employees trained to use the lethality phone. The lethality phone was used by the sheriff, with the cooperation of prosecutors, to call victim advocates to provide a lethality assessment to determine bonds for abusers.

31. Defendant was aware of the hours Plaintiff spent completing tasks for the organization before and after her "set schedule." In addition to the activities log submitted by Plaintiff each week, Ms. Williams and Ms. Yohe set an extensive list of duties that required her to work before and after her shift.

32. If Plaintiff's tasks were not completed on time, Ms. Williams put Plaintiff in "Apricot jail." In Apricot jail, employees are required to enter three months of data onto the data entry software, known as Apricot, before being able to complete any other tasks. In Apricot jail,

employees are forced to write a sign on their cubicle stating they are in Apricot jail so other employees leave them alone.

33. Because Plaintiff feared termination if she did not complete her tasks on time, she had to work extra hours every week to keep up with the amount of work assigned to her.

34. Ms. Williams explicitly told Plaintiff to only report 80 hours biweekly on the time clock used to report her hours for pay no matter how many hours she worked.

35. In addition to the time clock, and the activities log, Plaintiff also tracked her time in a calendar provided to all employees by Defendant at the beginning of each calendar year.

36. Ms. Williams told Plaintiff to "flex" any hours she may have over forty. "Flex" time was calculated by subtracting the number of hours worked over forty from the next week in the pay-period so her hours would not exceed forty per workweek.

37. Plaintiff could not flex her time due to her heavy workload each week.

38. Because of the mix of flex hours, unreported overtime, and off-the-clock work, Plaintiff's activity sheets, calendar entries and time clock reports never matched.

39. Ms. Williams regularly told Plaintiff that she could never clock in before 8:00 even if Plaintiff was required to get to work early by the tasks set for her that day.

40. The time clock reported time every fifteen minutes, and Ms. Williams told Plaintiff that clocking in minutes before 8:00 a.m. would result in an extra fifteen minutes of pay. If Plaintiff clocked in after 8:00 a.m., even by 7 minutes, she would not get paid for a full fifteen minutes.

41. After meeting with the board in 2016, Ms. Williams announced that all employees would start to receive overtime compensation for any hours worked over 40.

42. Plaintiff worked overtime almost every week, if not every week, yet she saw only one or two paychecks that reflected overtime compensation in 2016.

43. Defendant began to find ways to cut Plaintiff's time to ensure she would not receive overtime pay. Plaintiff was forced to take periodic fifteen-minute "breaks" off the clock even though her workload required her to work through the breaks.

44. Plaintiff was also forced to clock out for lunches though Plaintiff was not relieved from her duties during that time and frequently worked through her lunch to complete her job duties in a timely manner. This became Defendant's ongoing strategy to cut overtime pay once overtime pay was offered.

45. After Ms. Williams began cutting hours, Plaintiffs often had little to no overtime reflected on her paychecks.

46. In January of 2018, when Plaintiff inquired about staying clocked in while she worked, Ms. Williams told Plaintiff, "If you stay clocked in, it will cost me extra money, the Board will get mad, and I can't have that!"

47. These practices worsened when Ms. Yohe replaced Ms. Williams.

48. To cut hours, Ms. Yohe often forced Plaintiff to go home, simply because she "looked sick."  However, Ms. Yohe still expected Plaintiff to complete all her job duties regardless of the amount of time Plaintiff was permitted to be in the office.

49. Because of this, Plaintiff often worked from home or came in to work even earlier or stayed even later to complete the tasks required of her.

50. Plaintiff still asked about overtime. Most recently, Plaintiff asked Ms. Yohe for overtime pay in April 2018. Because April is sexual assault awareness month, Defendant required Plaintiff to give extra presentations in the community, which created additional off-the-clock work.

51. In response Ms. Yohe told Plaintiff, "We can't afford overtime, and there won't be any overtime this month."

7

52. In April 2018, Plaintiff went to the local courthouse early in the morning to set up for a presentation. Defendant Yohe called Plaintiff and said, "You need to get to the office right now, but don't clock in before 8:00!"

53. On May 16th, 2018, several employees approached Plaintiff and told Plaintiff Ms. Yohe asked them to tell Plaintiff to quit.

54. On May 17, 2018, Ms. Gish cornered Plaintiff and began screaming at her as soon as she walked in the door.

55. Plaintiff has PTSD and received various accommodations relating to that diagnosis from Ms. Williams in 2015, including having a quiet place to work and not being "cornered" in meetings or individual conversations.

56. Plaintiff was traumatized by Ms. Gish's behavior and was required to leave work for the rest of the day to recover.

57. On May 18, 2018, Plaintiff attempted to return to work, but Ms. Gish physically blocked her from coming more than a few feet into the building. Ms. Gish then screamed at Plaintiff to "get out."

58. Later that day, Plaintiff was informed her office had been cleared out, staff was informed that she no longer worked there, and another employee, Sharon Colley, had been offered Plaintiff's job.

59. Plaintiff did not return to work for Defendant after May 18, 2018.

**Count I: Fair Labor Standards Act - Failure to Pay Minimum Wage**

60.     Plaintiff hereby incorporates as if set out fully herein all previous paragraphs of this Complaint.

61.     At all times material to this action, Defendant was the "employer" of Plaintiff within the meaning of 29 U.S.C. § 203(d).

62.     At all times material to this action, Plaintiff was an "employee" of Defendant as defined by § 203(e)(1) of the FLSA, and worked for Defendant within the territory of the United States within the Three (3) years preceding the filing of this lawsuit.

63.     At all times material to this action, Defendant was an enterprise engaged in interstate commerce as defined by §203(s)(1) of the FLSA.

64.     Defendant was and is, subject to the pay requirements of the FLSA because its employees are engaged in interstate commerce and Plaintiff was regularly engaged in interstate commerce during her employment with Defendant.

65.     For instance, Plaintiff regularly made out of state phone calls; received and sent interstate mail and electronic communications; ordered and received goods from out-of-state suppliers; handled credit card transactions; and performed accounting for out of state donations. Further, Plaintiff regularly purchased out of state bus tickets and facilitated transporting victims across state lines to stay with out of state family or friends.

66.     Defendant did not pay Plaintiff the federal minimum wage for all hours worked, in accordance with the FLSA, 29 U.S.C. § 206 *et. seq.*, which provides minimum hourly rates an employer shall pay to each employee for hours worked.

67.     The Federal Minimum Wage is $7.25 and has been $7.25 since July 2009.

68. The foregoing conduct, as alleged, was committed knowingly, willfully and maliciously by Defendants in violation of the law, as Defendants knew or showed reckless disregard for the fact that their compensation practices were in violation of the law.

69. As a result of the aforesaid willful violations of the FLSA's overtime pay provisions, overtime compensation has been unlawfully withheld from Plaintiff. Accordingly, Defendants are liable under 29 U.S.C. § 216(b) for unpaid wages, as well as liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

**Count II: Fair Labor Standards Act - Failure to Pay Overtime**

70. Plaintiff hereby incorporates as if set out fully herein all previous paragraphs of this Complaint.

71. Defendants violated 29 U.S.C. § 207 by employing Plaintiff for workweeks longer than 40 hours without compensating her for her work in excess of 40 hours per week at a rate of one and one-half times her regular rate of pay for which he was employed.

72. The foregoing conduct, as alleged, was committed knowingly, willfully and maliciously by Defendants in violation of the law, as Defendants knew or showed reckless disregard for the fact that their compensation practices were in violation of the law.

73. As a result of the aforesaid willful violations of the FLSA's overtime pay provisions, overtime compensation has been unlawfully withheld from Plaintiff Defendants. Accordingly, Defendants are liable under 29 U.S.C. § 216(b) for unpaid overtime, as well as liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

### Count III: Fair Labor Standards Act – Retaliation

74. Plaintiff hereby incorporates as if set out fully herein all previous paragraphs of this Complaint.

75. Plaintiff engaged in activity protected by the FLSA, including but not limited to the following: (a) making a claim to Defendants for failure to pay overtime wages; and (b) complaining that Plaintiff is entitled to compensation after Defendants refused to pay Plaintiff.

76. Plaintiff was retaliated against and terminated, or in the alternative, constructively terminated Plaintiff because of her protected activity.

77. Defendants' actions violated the anti-retaliation provision of the FLSA, 29. U.S.C. 215(a)(3).

78. As a direct and proximate result of Defendants' unlawful retaliation against Plaintiff, Plaintiff sustained and continues to sustain damages.

79. Defendants' actions were intentional, willful, knowing, wanton, and malicious, and in flagrant disregard for Plaintiff's rights, and entitle Plaintiff to an award of punitive and or liquidated damages.

80. Pursuant to 29 U.S.C. § 216(b), Plaintiff seeks reinstatement, and damages of lost wages, compensatory damages, liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

### Count IV: Missouri Minimum Wage Law - Failure to Pay Minimum Wage

81. Plaintiff hereby incorporates all previous paragraphs as if fully set forth herein.

82. At all relevant times, Plaintiff was an employee entitled to the rights, protections, and benefits provided under the MMWL, R.S.Mo. § 290.500, *et seq*.

83. At all relevant times, Defendant was an employer within the meaning of the MMWL.

84. Pursuant to the MMWL, employees are entitled to be paid at least the state minimum wage for all hours worked in each workweek.

85. The Missouri Minimum Wage was $7.50 in 2014.

86. The Missouri Minimum Wage was $7.65 in 2015 and 2016.

87. The Missouri Minimum Wage was $7.70 in 2017.

88. The Missouri Minimum Wage was $7.85 in 2018.

89. Defendant, pursuant to policy and practices, violated the MMWL by refusing to pay Plaintiff the minimum wage for all wages earned.

90. Pursuant to R.S.Mo. § 290.527, Plaintiff seeks damages equal to all unpaid wages due within two (2) years preceding the filing of this Petition plus periods of equitable tolling, liquidated damages, costs, and reasonable attorneys' fees.  Plaintiff also seeks an award of pre-judgment and post-judgment interest at the applicable legal rate.

### Count IV: Missouri Minimum Wage Law - Failure to Pay Overtime

91. Plaintiff hereby incorporates all previous paragraphs as if fully set forth herein.

92. Pursuant to the MMWL, employees are entitled to be compensated at a rate of not less than one and one-half (1½) times the regular rate at which such employees are employed for all work performed in excess of forty (40) hours in a workweek.

93. Defendant, pursuant to policy and practices, violated the MMWL by refusing to Plaintiff for the overtime wages to which she is legally entitled for all hours worked in excess of forty per workweek.

94. Pursuant to R.S.Mo. § 290.527, Plaintiff seeks damages equal to all unpaid overtime wages due within two (2) years preceding the filing of this Petition plus periods of equitable tolling, liquidated damages, costs, and reasonable attorneys' fees. Plaintiff also seeks an award of pre-judgment and post-judgment interest at the applicable legal rate.

### Count VI: Quantum Meruit

95. Plaintiff incorporates by reference, as if fully set forth herein, all preceding paragraphs of this Complaint.

96. Plaintiff performed work, for which received a benefit, without receiving full compensation.

97. Defendant appreciated the fact of the benefit conferred upon it by Plaintiff.

98. The acceptance and retention of said benefit by Defendant is inequitable in light of the fact that Plaintiff was uncompensated and under-compensated for the benefits conferred upon Defendant, as more fully described above.

99. The payment requested by Plaintiff for the benefits produced by her is based on customary and reasonable rates for such services or like services at the time and in the locality where the services were rendered.

100. Plaintiff seeks damages equal to all unpaid wages due within the five (5) years preceding the filing of this Complaint plus periods of equitable tolling. Plaintiff also seeks an award of pre-judgment and post-judgment interest at the applicable legal rate.

### Count VII: Unjust Enrichment

101. Plaintiff incorporates by reference, as if fully set forth herein, all preceding paragraphs of this Complaint.

102. Plaintiff performed work, for which Defendant received a benefit, without receiving full compensation.

103. Defendant appreciated the fact of the benefit conferred upon it by Plaintiff.

104. The acceptance and retention of said benefit by Defendant resulted in unjust enrichment in light of the fact that Plaintiff was uncompensated and under-compensated for the benefits conferred upon Defendant, as more fully described above.

105. Plaintiff seeks damages equal to all unpaid wages due within the five (5) years preceding the filing of this Complaint plus periods of equitable tolling. Plaintiff also seeks an award of pre-judgment and post-judgment interest at the applicable legal rate.

### PRAYER FOR RELIEF

a. WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against Defendants and thereafter:

b. Declare the conduct engaged in by Defendants to be in violation of Plaintiff's rights;

c. Award Plaintiff such damages as are fair and reasonable, including lost wages and other benefits of employment, compensatory damages, emotional distress damages, punitive damages, liquidated damages, pre and post judgment interest, front pay, all in an amount over $25,000.00;

d. Restore Plaintiff to her rightful position with Defendants or, in lieu of reinstatement, order front salary and benefits for the period remaining until normal retirement;

    e.    Award Plaintiff equitable relief of back salary and fringe benefits up to the date of reinstatement and prejudgment interest for that entire period, or front salary and benefits accrual;

    f.    Award Plaintiff her costs and attorneys' fees; and

    g.    Grant such other relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues triable by a jury in the complaint.

Law Offices of Thomas E. Kennedy, III, L.C.

By: */s/ Sarah Jane Hunt*
Thomas E. Kennedy, III, 44617
Sarah Jane Hunt, 63899
906 Olive St., Ste. 200
St. Louis, MO 63101
(314) 872-9041
(314) 872-9043 fax
tkennedy@tkennedylaw.com
sarahjane@tkennedylaw.com